and my co-counsel is Lisa Rasmussen. She represents Deborah Martinez. Seldon, I'm going to be doing the argument today. The issues are identical for both defendants. The most critical fact to the resolution of this appeal is that the affidavit, which was not disclosed by the government, was not merely impeachment evidence, as in many of the cases that were cited by the court. This affidavit was a direct refutation of the testimony that the government elicited from the witness at trial. The testimony at trial was the secret sale occurred, and the test and the statements in the affidavit were I did not conduct any sales.  This is important because it just as was this Court pointed out in Bernal, Bernal-Beso, there was no inference that needed to be drawn by the jury with regard to credibility. This was direct evidence that showed that when Mr. Livedahl testified that the secret sale occurred, which was a key event in this case, that he made a sworn statement days after the sale that was supposed to have occurred, saying it did not occur. Now, he didn't disclose the secret sale that he testified to at trial until he was getting ready for sentencing in another criminal case, a year after he had given the sworn affidavit saying the sale did not occur. And he wanted to talk to the Nevada prosecutors. He wanted the Nevada prosecutors to give him a benefit for now. Mr. Horstman, you're saying that Livedahl testified, I sold him the drugs January 13th and 14th. Correct. And then in his affidavit he said, I didn't sell any drugs after a certain date. I did not make any sales between the date of the issuance of the preliminary or the temporary restraining order in December and the date that he filed the affidavit, which was January 18th. Now, but there was in evidence, if my notes are correct, that he, Livedahl, and he was cross-examined on this, that he said the conspiracy ended on or about January 11th, 2005, the day after the Florida court entered a preliminary injunction prohibiting defendants from selling any more of the TRI type A. So there was other evidence which contradicted him on the same subject. When there is a contradiction between a witness's statement on one occasion and a witness's statement on another occasion, that contradiction serves to impeach his credibility. Well, the credibility was impeached by other evidence. The evidence that was kept out, the braiding material, simply was more contradiction on the central subject of whether any sales were done after January 11th. But of a different kind, and that's why this is so important. It's that simply impeaching his credibility, saying the guy's a liar, which the judge said he was a liar. No one is saying Livedahl's a liar. The judge said he was a liar. The judge isn't testifying. Okay. No one is testifying that Livedahl is a liar. Livedahl is telling two conflicting stories. I sold it on January 13th and 14th. I didn't sell it. And I didn't. Right. You've got two instances of I didn't, one in the record and one that isn't in the record. Now, tell us why the suppressed braiding material was so different in character that it would further, it would materially impeach Livedahl beyond that which he was already impeached by his own other statements. The sale was critical to the government's case. So when Livedahl gave a sworn statement saying that the testimony that he gave at trial was false, now the government's theory is that testimony at his trial was true. Our defense theory at trial was the sale didn't occur and, in fact, the affidavit was true. But the jury never heard about the affidavit. The government's position was that the claim that he hadn't sold, that the conspiracy ended on January the 11th was not true because he sold on January 13th and 14th. Right? The whole, the issue is, the issue with regard to. Another inconsistent statement saying I didn't sell on January 13th and 14th. So he had two statements saying I didn't sell on January 13th and 14th and he testified that he sold on January 13th and 14th. I think the difference is, is that. I'm sorry. I don't mean. You see, we'll understand your answer better if you wait until Judge Begg. I will do that. Go ahead. The Livedahl's testimony about the conspiracy ending on the 11th was his attempt to whitewash and say why it is that he had lied on other occasions in Florida. Okay? It was not testimony that said I, the secret sale occurred or the secret sale did not occur. It was simply he was explaining away, because the prosecutor had prepared him to testify that his lawyer told him to stay in a box, this is why he lied in Florida, that his, that he was, that he thought this conspiracy had ended and therefore that's why he didn't talk about it. He was responding to the issue of why he didn't tell anybody about the secret sale until the Nevada prosecutors came to talk to him. He was not, there was nothing before the jury, there was certainly no sworn statement as the affidavit was, there was no sworn statement that was given to the jury to say that shortly after the sale occurred, he told the federal court in Florida and the U.S. attorney in Florida that the secret sale did not occur. I have, I'm kind of confused in this case because I don't understand why this is necessarily a Brady problem. Wouldn't it be a standalone newly discovered evidence issue also? We brought it as a newly discovered evidence. So even if we don't think it was a Brady violation, we can just approach it head on. It's newly discovered evidence of which you were unaware that reflects on the integrity of this trial. You could, yes, you could. But we presented it as a Brady issue. We brought it as a motion for new trial based on newly discovered evidence. Is there any evidence at all that the government knew of that affidavit and either suppressed it or didn't bring it to your attention? Well, as long as you follow the line of cases starting with Kyle's, then the government knew about it. I'm not asking about cases. I'm saying have you uncovered any evidence that they knew about it and sat on it? Your Honor, we were not given a hearing. And so we were unable to question. Then I'll ask you the question for the third time. Have you uncovered any evidence that they knew about this and sat on it and did not live up to their Brady obligation of turning over something they knew about? Your Honor, I have to qualify it because the government knew about it because they were served with it. The government had it. The investigating agency had it. You're talking about the government. What about the prosecutors in the case that we're talking about? I do not have evidence that the local prosecutors had it. Right. So you would extend Kyle's beyond the immediate team to the entire government? I think that Kyle's had it. What you would have Kyle's hold is that if anywhere, any place, any time in the United States government worldwide knows something, it's a Brady violation if the government doesn't go looking in Thailand, India, Italy, whatever it is, and find it. That's not what I'm asking. Because the way I read the Brady cases and the Kyle's cases, it's the government's team. And the government's team in this case is not the team that had the affidavit down in Florida. I don't know that. So that doesn't stop me from worrying about the affidavit, because it is directly contradictory to Libdol's testimony. The government's team in this case was also the investigating agency. The investigating agency is the FDA. Now, we don't need to pursue your argument. That's what I'm trying to tell you. Okay. Okay. Well, the directly contradictory affidavit was newly discovered evidence. We did not have it. I'm not contending that the local prosecutor in his file had it. Okay. And what's the standard of review that I should use if this is just a newly discovered evidence problem and the trial court said it wouldn't have made any difference? I think the standard of review is de novo, because that would be a conclusion of law, is that it would be a de novo review, particularly since we had no evidentiary hearing. The trial judge takes a look at the evidence that was kept out, compares it with all the other evidence in the case, and says it wouldn't have made any difference. Is that the conclusion of law? Yes. I believe it is, yes. Maybe mixed. Maybe mixed. Mixed is your better answer, probably. Maybe mixed. I don't think that that's our in-bank rule. We might take a look at Hinkson v. USA. Okay. I will do that. This was presented as a Brady issue, though, to be fair. It wasn't presented as a straight out newly discovered evidence. I'm aware of that. Now, why don't you address the issue of whether it would have made any difference? Yes. Well, there's so much evidence of Mr. Selden's guilt. And if it had made any difference, if it had made any difference to Mr. Selden, what difference would it have made if Liddall, if another affidavit impeaching Liddall had come in? And, Your Honor, that is why I raised the initial issue of the importance of the fact that it is directly contradicting Liddall's testimony on a critical event in the case. There was no corroborating evidence of Mr. Liddall's testimony that this sale occurred. No, but let's talk about the other evidence that was in the case. There was no substance that they found. When they searched the medical practice, all they found was legitimate toxin. The case depended upon Chad Liddall. They put together a circumstantial case with this chart, and the chart said that this doctor stopped buying Botox from the company. Allergen. From Allergen, the company that basically had the only approval to do it. He had X plus. Yes, so he had X plus. They went through these records of the medical practice, and they went through and they said, well, these people all said that they got Botox. They couldn't have had the Botox because they didn't buy it directly from the manufacturer. So, therefore, it must have been this other substance, and that's where. That's one piece of evidence. How about Elizabeth Long? Elizabeth Long testified she saw an injection of the non-allergen Botox. There was no analysis, Your Honor. They don't know what it was. I mean, the doctor told the people what he was doing in the demonstration. Elizabeth Long has no motive to lie. She said this is what he told us he was doing. She heard him tell the audience he was using the drug in his practice because it was stronger, could be diluted more, and could earn more money than from Botox. Boom. Zap. I mean, Elizabeth Long is pretty tough. Okay. That evidence is there. That evidence is there. And then he injected nearly 140 more vials worth of Botox than he had purchased from Allergen. Well, that comes from the chart, okay? And that chart depends upon this sale that Chad Livedahl is the only witness who testified to it have occurring. What did Todd corroborate? Todd didn't talk about the sale. What Todd talked about was he went to Las Vegas and he changed the entries in the doctor's appointment. To cover up what? Apparently to cover up that to say to take out Botox and put in cosmetic procedure. No, to take out Tritox and put in cosmetic procedure. No, no, that's not correct. To take out Botox. Tritox was never entered in the medical records. He wasn't using it. In our theory, he was never using Tritox. But then Dr. Selden was. But the purpose was to cover up the use of Tritox. I think for Livedahl it was. Right. The problem is that they came in and changed the records and then the evidence from the search shows that they went right back to putting Botox in. I thought it was at the Selden's request that Todd came out and helped them clean up the records. That's what Chad said. And I think Todd may have said it was at Debbie Selden's request. But other than that, they didn't follow through on that. And they continued to put Botox in the records, in the medical records. So, you know, it's sort of confusing what is this doing in here. There's no question, really, that the chart that could not be supported absent the secret sale was the key evidence in this case. If for nothing more than showing the repeated use of Tritox according to the government. And that chart would fall apart without the secret sale. Okay. You've got a minute left. Do you want to save that for a vote? I'd like to save that. Good morning. May it please the Court. Adam Flake for the United States. I'd like to apologize about my voice. I'm not emotional if I come out sounding that way. My voice is giving me trouble. Also, I must admit that this, the opening argument, this case did take a turn for the unexpected to me. I had not thought about this case in terms of a newly discovered evidence claim. I had viewed it through the lens of Brady, the manner in which it was presented. And I must admit, I do not know off the top of my head what the standard of review for a new evidence claim is. I just didn't think about that. The new evidence would be on a motion of new trial. It would be whether the new evidence would change the trial court's view as to the preponderance of the evidence, right? Thank you, Your Honor. I agree. And under that standard, the district court, once again, the district court addressed this in terms of a Brady claim. But the district court did very carefully go through the evidence when he found it not material. He pointed to the other evidence in this case. He said, you know, this particular affidavit would not be material. If you took Livedahl out of your case, what do you have? The other side says you don't have anything. I disagree, Your Honor. We have an idea. Do you think you could convict the Seldins without Livedahl's testimony, with just charts and stuff like that? Yes, Your Honor. You pointed to the testimony of Elizabeth Long, for one thing, very, very direct evidence. The defense would like to disregard the charts altogether. But even without the testimony of Livedahl, we have invoices showing that they purchased Botox up to a certain date. On that date, they stopped and started purchasing Tritox. And we have invoices. We're talking a lot about the secret sale, the January 13th secret sale. But there were many purchases of Tritox before that took place. And so we have purchasing Botox, stopping, purchasing Tritox. Tri comes under investigation. Suddenly, they're very interested in purchasing Botox again. We have them giving more injections of Botox than they have purchased. Now, I'm not trying to ‑‑ I don't want to make the Court think that I'm trying to argue that we didn't, you know, that Chad Livedahl was totally worthless for us. He certainly helped tie the case together, and he helped tell the story of the case. But even without Livedahl altogether, our case by no means falls apart, Your Honor. If you tried this case over again, would you call Livedahl as a witness? I'm not ‑‑ I'm not sure, Your Honor. I did not try the case the first time, and I have not discussed it with trial counsel. I wouldn't feel comfortable. Wouldn't it be misconduct for government counsel to call a witness who they knew was perjurer? That they knew was a perjurer? Yes, we knew he was a perjurer, Your Honor, but we didn't ‑‑ You tried to front that, really, didn't you? Yes, Your Honor. And if I could also ‑‑ I mean, if you have a great case, you probably wreck it by calling Livedahl. Your Honor, it's hard for me to try to delve into the strategic decisions that ‑‑ Yeah, I know, but it's hard for us, too, because we have to decide whether this whole thing rendered that trial ineffective, improper, unfair. If I could, I don't mean to ‑‑ There is a rocket propelled grenade into the credibility of Livedahl on the direct issue in the trial, isn't it? That's what I wanted to address, Your Honor. Right. And that is that the plea agreement which came into evidence, which there's no doubt the plea agreement is ‑‑ Livedahl's plea agreement. Livedahl's plea agreement. It says, I made X amount of money. The conspiracy ended on January 11th. Now, Livedahl's future testimony, I mean, what came in at trial is, I made a sale on January 13th. The defense had that, and the defense made hay with it in their closing argument. If I could just read from defense's closing argument, and I'll ‑‑ I cited this in my brief. I'm not able to find the site, but it is in my brief. He's talking about the preliminary injunction. He violates that, too, and he sells it. He lies in his sentence because he doesn't tell Judge Cohen any of this. He never discloses to the Florida court that there's the missing tritox out there that he's incinerated. That's nonexistent, because he testified for the first time that he discussed this ‑‑ for the first time he discussed this fantastical, psychedelic‑induced story was on January 10th, 2006. Now, he's not making precisely the same use of the plea agreement that current defense counsel would, but they certainly had the ability to do that. They certainly had the ability to say, you said that you turned up ‑‑ that the conspiracy ended on January 11th. Now you put that in a document that you suborned ‑‑ that you gave to the court, and now you're perjuring yourself because you're saying the conspiracy didn't end on January 11th, right? Because you made the same ‑‑ Was he confronted on the stand with this plea agreement? Yes, it was in evidence. And was he asked, was that a lie, or was that the truth, or was that a misrepresentation? Well, he was ‑‑ Did he try to weasel out from under that, the way he tried to weasel out from under everything else? Well, he was asked very specifically about the loss amount that is contained in the plea agreement. They asked him very specifically. Now, this number, this 12,000 ‑‑ excuse me, this ‑‑ But was he asked specifically about whether the conspiracy ended on or about July 11th? You know, about is kind of a weasel word, but was he confronted with that? Not very directly, Your Honor, but he was asked about the $50,000 that he made off of the January 13th sale. He was asked repeatedly and in detail. Now, you didn't disclose this in the plea agreement, did you? That's not included in the ‑‑ and he did admit. That still falls a little short of what he'd be jammed with if he was on the stand with his affidavit. And then he gives this, well, I just sign anything, you know. The lawyers just tell me to sign it, I sign it, you know. I'm not trying to argue that it was ‑‑ I mean, it wasn't word for word what is contained in the affidavit, but I don't think that we're required to show that it was word for word. I think that the standard is that new evidence ‑‑ in a Brady claim, once again, I'm addressing it in terms of Brady because that's the way that I looked at it. You know, I'm addressing it more in terms of materiality, I guess, whether it would have made a difference. But for a Brady claim, the evidence needs to be new and different. It needs to put it in a different light. And the cases that talk about it is, you know, they have some bad stuff on a guy, but then they find out that he's a cooperator. You know, and that, I mean, that changes the story a lot in an entirely different light. Here we have the guy's not telling the truth. He entered into a plea agreement that is contradicting what he said later on, and also he did an affidavit that was what he said later on. And so it's ‑‑ I don't think that it is a, to use your honor's word, I don't think that it is a rocket propelled grenade relative to the other information that was available, namely the plea agreement. It seems like to me it's the final nail in the coffin. I mean, I'm not denying that it is an additional piece of evidence that they could have used, but I don't think it meets the materiality standard. Is there any better evidence that they could have ever found on this issue? I think that ‑‑ A direct contradiction under oath? They have a direct contradiction in the plea memorandum, your honor. It says honor about. What does about mean? I don't think anybody ever argued that the conspiracy, he was trying to say that, oh, I said the conspiracy argued on ‑‑ ended on January 11th, but actually I meant it ended on January 14th. It was quite clear that he admitted that this plea ‑‑ What was ‑‑ let's go into that. What was the date of the preliminary injunction prohibiting defendants from selling any more TRIs bought to Linum Toxin Type A? January 11th. That was ‑‑ that was the date of the preliminary injunction. Yes. So he says that he didn't sell any ‑‑ the conspiracy ended on or about January 11th, as Judge Schwartz pointed out, the day after the court entered a preliminary injunction. That's correct, your honor. So his preliminary injunction was entered on January the 11th. It was on. I don't want to misspeak, your honor. Let me take a look at the preliminary injunction. It was January 11th, your honor. Okay. So we can ‑‑ after he identifies it was entered, the conspiracy ended with the preliminary injunction entered, then we can take out the or about on January 11th. Yes, your honor. I believe that's a fair reading. Okay. Pardon me. Go ahead. If the court has any other questions, I'm happy to address them. Thank you. Ms. Horsman, would you like ‑‑ we'll give you two minutes. My reply brief at page 11 and 12 tells you what happened during the cross-examination on the plea agreement. Chad Livedahl says, well, was this $50,000 we're talking about from the secret sale? That wasn't in what you pledged, was it? You lied, didn't you? Here's what Chad Livedahl says. I wouldn't say I lied. When he was asked about ‑‑ All I did was I signed what my lawyers put in front of me. I signed what my lawyers put in front of me, and then when he was asked ‑‑ It didn't account for anything. And then when he was asked about whether or not this was included in the conspiracy, he said, I thought it was included in the conspiracy. So that's what ‑‑ he set up a situation where he could explain his various lies in Florida, but where he would not be able to be confronted with this affidavit because the defense did not have it. I want to address just two things. How did the defense find out about it? I was ‑‑ New Counsel, I was ‑‑ we were appointed for the appeal. We started just milling around and looking at stuff, and we pulled up the Florida docket and we found it. And we looked at it and I said ‑‑ The same Florida docket that was in existence at the time of the trial? It was ‑‑ yes, it was in existence. Okay. It was in existence. And, you know, we didn't really have time to talk about the fact that they gave us some material from that docket but not this. We didn't have an evidentiary hearing, so we were not able to say did the agent who got the transcript just leave that there? The evidence that you're talking about that you didn't get was a matter of public record at the time of the trial? It was. Okay. It was. But that doesn't solve the problem. And I would commend the court to look at United States v. Payne because the facts are on all fours. We talk about ‑‑ The Bond case that the government served on us either yesterday or this morning. Bond ‑‑ 2009, a new case. I know. But it then brings up the whole issue of what's dictum. It's whether or not Ben v. Lambert, a three‑judge panel, and Bond both ‑‑ whether or not ‑‑ Ben v. Lambert, it says that dictum with regard to the standard for if the defense has enough information in order to be able to ascertain the nature of the exculpatory evidence. Ben v. Lambert, this court held, the three‑judge panel held, that's dictum. You can't rely on it. It would take me ten minutes to talk about what the problem is here. Kyle's changed everything. It did change everything. But we're not yet sure how much it changed. As I said earlier, you have to go to Thailand and ask the FBI, have you ever heard about Dr. Selden? You have to put out a worldwide broadcast. Has anybody ever dealt with this character? Or is it just the government's immediate team plus the law enforcement people and everything else? And then if it's beyond that, then I think you get into the question of newly discovered evidence. Well, no, I think Blanco answered that question. I'm not asking anybody to go to Thailand. I am asking them, and I'm very concerned that the government has refused to look at the files of this same multijurisdictional investigation by the FDA using Chad Livedahl. We asked and we asked and we asked for the government to, would you search those files to see if there's anything else? Now that we see that you didn't have the affidavit, what else might be out there? Government has refused to do it. So setting aside Kyle's, I think prosecutors ought to do that anyway when they're talking about witnesses like Livedahl. Well, and when you have a multijurisdictional investigation of the same subject matter, using the same investigators, using the same investigative office of the FDA, and using the same witness, we're not talking about Thailand, Judge. We're talking about this investigation. It was the same investigation. And they refused to look in the files. The judge wouldn't rule on it. What do you mean they refused? They said the case is over. We're not looking. Okay. And the judge, we asked the judge. Who's this they? The local prosecutor. The person who tried the case. The person who tried the case. The AUSA that tried the case. And we asked, so we asked the judge to order that. The judge refused to rule on that. We're asking in this appeal for this Court, just as the Court did in Blanco, just as the Court did in Bracey, is to remand it for an order and request that the Court order that the additional search be done. To the extent there are still factual questions with regard to whether or not the investigative agent in this case, for instance, saw that affidavit and left it there and didn't give it to the local prosecutor, we want an evidentiary hearing in order to be able to explore that. So the Blanco case is 392 Fed 3rd, right? Yes. And that's one where the Court ordered was a remand for them to look in the INS files. It was a Reno case, and it was for the U.S. attorney to look in the INS files for impeachment material. That's my law clerk who got me the Blanco case. Thank you very much. Do you have the site, Sarah? We thank counsel for their presentations. And the Court stands adjourned for the week. Thank you very much. Thank you, Your Honor. These all present on behalf of the District Court of Columbia, I take these court appeals from the Ninth Circuit for an amnesty. And this court will recessional now and adjourn.
judges: Stafford, Trott, Bea